IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DALE ARNDT | * |
| | * |
| v. | * Civil Case No. 14-111-JFM |
| | * |
| CAROLYN W. COLVIN | * |
| | * |

************

# MEMORANDUM OPINION

## I. Introduction and Procedural History

Plaintiff, Dale Arndt, ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), for judicial review of the final determination of the Commissioner of Social Security ("Commissioner").

On April 20, 2005, the Commissioner determined that Plaintiff was disabled as of January 11, 2005, due to a heart transplant. On June 2, 2010, the Commissioner determined that Plaintiff had experienced medical improvement and was no longer disabled as of June 1, 2010. Thereafter, an administrative hearing was held on September 20, 2012, before Administrative Law Judge Douglas Cohen ("ALJ"). Plaintiff was represented by counsel and testified at the hearing. Plaintiff's treating physician, Dr. John Charles Jageman, and an impartial vocational expert ("VE") also testified at the hearing.

On October 25, 2012, the ALJ rendered an unfavorable decision, in which he found that Plaintiff's disability ended as of June 1, 2010, as a result of medical improvement. As of that date, then, the ALJ found that Plaintiff could perform light and sedentary work with limitations. The ALJ's decision became the final decision of the Commissioner on February 20, 2014, when the Appeals Council denied Plaintiff's request for review.

On April 14, 2014, Plaintiff filed a Complaint in this Court seeking judicial review of the ALJ's decision. (Docket No. 1). The parties have filed cross-motions for summary judgment and briefs in support thereof. (Docket Nos. 6, 8, 9). Plaintiff contends that the ALJ's decision is not supported by the record. The Commissioner contends that substantial evidence supports the decision of the ALJ. For the reasons that follow, the Court agrees with the Commissioner. The Court will therefore grant the motion for summary judgment filed by the Commissioner and deny the motion for summary judgment filed by Plaintiff.

### II. Statement of the Case

#### A. General Background

Plaintiff was born on October 22, 1967, and was forty-two years of age on June 1, 2010. (R. 19). Plaintiff graduated high school and attended vocational school in electronics. (R. 29-30). Plaintiff's last regular work was as a computer tech and cable and wiring specialist. (R. 59). The VE classified Plaintiff's past work in computer repair as a medium, skilled job, performed at a very heavy exertional capacity. (R. 59-60).

Plaintiff had a heart transplant in 2005, following a heart attack. The parties concur that from January 11, 2005 (his disability onset date) to June 1, 2010, Plaintiff's impairments were disabling. However, the ALJ found that the medical evidence of record reflects that by June 1, 2010, Plaintiff's physical limitations had improved to the point that he was no longer disabled. (R. 15-21).

#### B. Hearing Testimony

At the ALJ hearing, Plaintiff testified he has been seeing his heart specialist annually, but recently started seeing him every six months because of his age. (R. 30-31). He testified that he has never had any mental health treatment, and has not had any visits with his vision

specialists in several years. (R. 31-32). He testified that he was no longer taking medications for diabetes. (R. 32). He testified that during the day, he walks on his treadmill, swims in an indoor pool, sometimes takes a nap, plays on his computer, and watches TV. (R. 34). He occasionally goes out with friends. *Id.* Plaintiff also testified that he likes to mix music, but does not go out and hear music at all. (R. 35). He testified that he took a trip to Grand Rapids, Michigan to participate in the Transplant Games, where he participated in table tennis and bowling. (R. 35-36). He testified that he is unable to do his prior work due to his eyesight, lack of depth perception, and shaking hands which interfere with fine motor activities. (R. 37-38). He testified that he is unable to exercise when he is sick or when his Achilles tendon acts up. (R. 38). Plaintiff testified that he is wearing therapeutic shoes for diabetes, but otherwise just has to watch what he eats and have annual foot exams. (R. 39-40). He testified that he has osteoporosis, for which he takes medication but has no other restricted activities. (R. 40-41). He testified that his cholesterol is managed with medication. (R. 41). He further testified that doctors have advised him to live a stressless life, and that he has a compromised immune system because of his transplant and cannot buy over-the-counter medication. (R. 42). Plaintiff testified that sitting is not a problem, but that he could not stand for four hours. (R. 43). He testified that he gets headaches if he looks at a screen too long, and that he can only lift up to 20 pounds on occasion. (R. 43-44).

Dr. Jageman testified that he is Plaintiff's primary care physician and sees him every three to four months. (R. 46). He testified that Plaintiff gets Achilles tendonitis "from time to time" which resolves with warm heat and rest. (R. 48). He testified that the diabetic shoes were prescribed to help with Plaintiff's background of diabetes but also the problems with occasional Achilles flares. (R. 49). Dr. Jageman testified that Plaintiff had anxiety about an increased risk of infections, and described him as having "a significant level of stress and anxiety." (R. 50-51).

3

He testified that Plaintiff is managing his diabetes "okay by diet" and has "been fairly successful in keeping it within reason." (R. 51-52). Dr. Jageman testified that Plaintiff's osteoporosis "incorporates a lack of stamina and ability to do routine jobs that he would have been able to do, prior to the transplant." (R. 52). When asked for Plaintiff's residual functional capacity, Dr. Jageman opined:

> I think he can probably do a couple hours of work here. Okay. Very basic IT and computer-type repairs. Very, very basic things, that probably could be done, based on knowledge of four or five years ago. I think from time-to-time, he can engage in his DJ activities for an hour or two. He has people lift all the equipment to a given site, where he sits and spins records, okay. Perhaps four or five times a year. That's, that's really as much as this man can do, as he attempts to stay home and keep his weight down as much as possible, and limit activities to avoid flares of his arthritis, osteoporosis, Achilles tendinitis [sic], et cetera.

(R. 53). Dr. Jageman conceded that he had not referred Plaintiff for mental health treatment, and simply had told him to avoid stress and try and relax. (R. 54). Dr. Jageman also testified that that his conversations with Plaintiff are not transcribed verbatim in the medical records, which focus "on his transplant, diabetes, and cholesterol." *Id.*

### C. Medical Records

Between 2010 and 2012, Plaintiff had regular annual follow-up appointments with Dr. Leway Chen in the "Outpatient Heart Failure/Transplant Clinic." (R. 410-45). Objective testing revealed no significant problems. *Id.* On April 13, 2010, Dr. Chen noted that, "Over the last year, he has not had any medical problems," noting only a recent foot injury that is improved with use of diabetic shoes and molded arch supports. (R. 418). After examination, Dr. Chen noted that, "[f]rom a cardiac perspective, he continues to do amazingly well." (R. 420). On March 8, 2011, Dr. Chen noted that over the course of the year, the only significant adverse medical events were a prolonged upper respiratory infection contracted shortly after an influenza vaccine, which improved with prescription cough medicine, and a diagnosis of Bell's palsy,

4

which caused no significant discomfort. (R. 414). Dr. Chen opined that, "[f]rom a cardiac perspective, he continues to do quite well." (R. 416). On April 3, 2012, Dr. Chen noted that Plaintiff has suffered intermittent Achilles heel tendonitis over the past year, but that inserts in his diabetic shoes have improved his comfort. (R. 410). Dr. Chen stated, "[f]rom a cardiac perspective, he continues to do well." (R. 412). Dr. Chen suggested that Plaintiff "increase his efforts at exercise and weight loss." *Id.*

On April 15, 2010, August 16, 2010, and November 15, 2010, Dr. Jageman noted that Plaintiff was "doing well" and had a normal examination. (R. 447-48). During November and December 2010, Plaintiff called Dr. Jageman on several occasions regarding coughing and a cold, for which Dr. Jageman prescribed medication. (R. 449). Plaintiff called Dr. Jageman on January 27, 2011, to seek advice about what medications he could take for Bell's palsy. (R. 450). At the time, he reported "no headaches or visual symptoms." *Id.* Dr. Jageman saw Plaintiff on March 21, 2011, and noted, "His Bell's palsy once again has nearly fully resolved as it has several times in the past." (R. 451). The remainder of the examination was normal. On June 22, 2011, Plaintiff saw Dr. Jageman, whose notes read, "Continue to do well with no complaints no cardiovascular symptoms." (R. 453). On October 28, 2011, Plaintiff had an appointment with Dr. Jageman, who noted that other than a slight decrease in magnesium levels, "he really has no other complaints doing quite well after heart transplant some years ago." (R. 456-57). Plaintiff saw Dr. Jageman on February 2, 2012. (R. 468-69). The notes reflect that "patient is doing well" and denies any headaches. *Id.* The examination was otherwise normal. *Id.* On June 6, 2012, Plaintiff saw Dr. Jageman, who reported that "patient is doing well." (R. 460). Plaintiff denied any headaches, and the only issue noted was a low vitamin D level. *Id.* Plaintiff visited Dr. Jageman on September 12, 2012. (R. 462). Dr. Jageman noted that "patient is doing well" and "denies any headaches." *Id.* The only issue noted is again a slightly low

magnesium level. *Id.*

On May 4, 2012, Dr. Jageman wrote a letter in which he opined that, "[t]aken as a whole risk of infection, tremor, advanced osteoporosis, poor physical conditioning and endurance, poor physical strength, diabetes, achilles tendonitis, stroke, and eye vision loss, his current acute and chronic anxiety worsening of a stable current transplant state" rendered Plaintiff unfit for regular employment. (R. 408-09).

### D. The Testimony of the Vocational Expert

The ALJ asked the VE if a hypothetical person of Plaintiff's age, educational background, and work experience would be eligible for a significant number of jobs in the national economy, if the hypothetical person were limited to light exertional jobs limited to standing or walking four hours out of eight, occasional climbing of ramps and stairs only, occasional balancing, stooping, crouching, crawling, kneeling, requiring no normal depth perception or peripheral vision, no working around hazards, avoiding concentrated exposure to dusts, fumes, odors, gases, environments with poor ventilation, wetness, humidity, and temperature extremes, with no operation of foot controls. (R. 60-61). Also, the person would be limited to simple, routine, repetitive tasks, not performed in a fast-paced production environment, involving only simple work-related decisions, and in general, relatively few workplace changes, and not involving high levels of stress such as independent decision-making, close supervision, or close interaction with coworkers or the general public. (R. 61). The VE replied that such a person would be capable of engaging in work as a "stock clerk," "hand packer," or "document preparer." (R. 61-62).

### III. Discussion

Based on the medical evidence of record and the testimony of the VE, the ALJ concluded that as of June 1, 2010, Plaintiff suffered from severe medically determinable impairments,

specifically, "status post cardiac transplant, right eye optic neuropathy, and diabetes mellitus." (R. at 14). However, the ALJ determined that Plaintiff's functional limitations had improved such that, as of June 1, 2010, Plaintiff was no longer disabled, and—consistent with the testimony of the vocational expert—Plaintiff was capable of engaging in substantial gainful employment. (R. at 16-21).

Plaintiff objects to the determination of the ALJ, arguing (1) that the ALJ should have recontacted Dr. Jageman to resolve ambiguity; and (2) that the ALJ should have identified good cause for rejecting Dr. Jageman's opinion. Pl.'s Br. 4-8 (Docket No. 7). Those arguments lack merit.

An ALJ must provide sufficient explanation of his or her conclusions to allow a reviewing court to understand the factual basis underlying the ultimate disability finding. *See Cotter v. Harris*, 642 F.2d 700, 704-05 (3d Cir. 1981). The ALJ need only discuss the most pertinent, relevant evidence bearing upon a claimant's disability status, but must provide sufficient analysis to allow the court to determine whether the rejection of other potentially pertinent, relevant evidence was proper. *See Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 203-04 (3d Cir. 2008) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000); *Cotter*, 642 F.2d at 706). In this case, it is clear that the ALJ met his responsibilities under the law.

42 U.S.C. § 423(f) provides that a claimant's disability benefits may be terminated where the claimant is no longer disabled. *See DuPont v. Astrue*, CIV. A. 09-1526, 2010 WL 4625540, *5 (W.D. Pa. Nov. 4, 2010) (citing *Losser v. Astrue*, CIV. A. 07-1473, 2008 WL 3540597 *4 (W.D. Pa. Aug. 12, 2008)). To justify termination of benefits, the ALJ must present substantial evidence illustrating work-related medical improvement. *See Palmer v. Astrue*, 284 F. App'x 873, 876 (3d Cir. 2008); 20 C.F.R. §§ 404.1594(b)-(c), 416.994(b).

A review of the record illustrates that Plaintiff has made substantial improvements since his heart transplant in 2005, when he was found to meet Listing 4.09. (R. 16). The treatment notes from Dr. Jageman repeatedly reflect that Plaintiff is "doing well." (R. 337, 448, 456). Dr. Jageman treated Plaintiff for occasional cold symptoms, occasional arch pain, and an episode of Bell's palsy. (Tr. 332, 336-37, 449-54). In addition, the annual examination records from Plaintiff's heart specialist, Dr. Chen, show that he was doing "well," "quite well," or "amazingly well." (R. 304-06, 364-67, 414-17, 410-13). Dr. Chen noted that Plaintiff's only significant medical events during 2010-2012 were upper respiratory infections, occasional Achilles tendonitis, and an episode of Bell's palsy. *Id.*

Although Plaintiff testified that he experiences headaches and memory loss, the ALJ correctly noted that there are no mentions in the treatment records from Dr. Jageman or Dr. Chen of either condition. (R. 14). In fact, the ALJ observed accurately that Plaintiff affirmatively denied headaches on at least seven occasions following June 1, 2010. *Id.* The ALJ relied upon this discrepancy, along with many other factors, in finding that Plaintiff lacked credibility. (R. 17).

With respect to the testimony of Dr. Jageman, the ALJ found no ambiguity in the records. Instead, the ALJ determined that Dr. Jageman's "testimony is contradicted by every one of his treatment records." (R. 17). The ALJ noted that while Dr. Jageman testified about Plaintiff experiencing tremors, tendonitis, fatigue, and medication side effects, none of those things are mentioned anywhere in Dr. Jageman's otherwise thorough treatment records. (R. 17-18). Moreover, the ALJ noted that Dr. Jageman's treatment records consistently reflected that Plaintiff had "no cardiac complaints" or was "doing quite well." (R. 19). Finally, the ALJ noted that Dr. Jageman's opinions were contradicted not only by his own treatment records, but by the treatment records from Dr. Chen. *Id.; see Plummer v. Apfel,* 186 F.3d 422, 429 (3d Cir. 1999)

("An ALJ may reject a treating physician's opinion outright only on the basis of contradictory medical evidence, but may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided."). Dr. Jageman provided almost no supporting explanation for his highly restrictive opinion of Plaintiff's functional capacity. (R. 53). Accordingly, the ALJ appropriately assigned Dr. Jageman's opinions "minimal weight." (R. 19). The ALJ also appropriately ascribed "significant weight" to the opinions of the reviewing state agency physicians, who believed Plaintiff was capable of work commensurate with the RFC assessment determined by the ALJ. (R. 390-96, 401-02). Remand is therefore unwarranted.

**IV. Conclusion**

Under the applicable standards of review and the record presented, this Court must defer to the reasonable findings of the ALJ and his conclusion that substantial evidence supports Plaintiff's work-related medical improvement as of June 1, 2010. For these reasons, the Court will grant the Motion for Summary Judgment filed by the Commissioner and deny the Motion for Summary Judgment filed by the Plaintiff.

An appropriate Order follows.

Dated: October 3, 2014                  /s/*J. Frederick Motz*
                                                            J. Frederick Motz
                                                            United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DALE ARNDT | * |
| | * |
| v. | *  Civil Case No. 14-111-JFM |
| | * |
| CAROLYN W. COLVIN | * |
| | * |

************

### **ORDER**

For the reasons stated in the accompanying memorandum opinion, it is, this 3rd day of October, 2014 ORDERED that

(1) Plaintiff's Motion for Summary Judgment (Docket No. 6) is DENIED;

(2) the Commissioner's Motion for Summary Judgment (Docket No. 8) is GRANTED;

(3) the Clerk is directed to CLOSE this case; and

(4) final judgment of this Court is entered pursuant to Rule 58 of the Federal Rules of Civil Procedure.

　/s/*J. Frederick Motz*　
J. Frederick Motz
United States District Judge